UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

AARON STEWARD,

        Plaintiff,

    v.

COUNTY OF SANTA CLARA, et al.,

        Defendants.

Case No. 18-cv-04119-SI

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On July 11, 2018, plaintiff Aaron Steward filed a civil rights complaint alleging two causes of action under 42 U.S.C. § 1983 claiming excessive force pursuant to the Fourteenth Amendment; one cause of action under California Civil Code 52.1 ("Bane Act"); and four causes of action for intentional infliction of emotional distress ("IIED") against defendants the City of Santa Clara, Deputy Rico West, Deputy Christopher Graham, Amy Le, Richard Guerzo, Tony Alvarez, Adam Valle, and DOES 1-100. Dkt. No. 1. After summary judgment, plaintiff's claims against Deputy West, for an alleged November 7, 2016 contraband search and July 12, 2017 altercation, and Deputy Graham, for an alleged July 12, 2017 rough ride, remained. Dkt. No. 83. The parties waived a jury trial, and the action came before the Court on April 26, 2021 through April 29, 2021. The Court makes the following findings of fact and conclusions of law.

## **FINDINGS OF FACT**

1. Plaintiff was a pretrial detainee in the Santa Clara County jail, Elmwood ("Elmwood") during all the events related to his remaining causes of action.

2. Defendant Deputy West is and was at all relevant times, a correctional deputy at Elmwood. On

November 7, 2016 and July 12, 2017, Deputy West was on duty and acting under the color of law and in the course and scope of his employment.

3. Defendant Graham is and was at all relevant times a correctional transportation deputy at Elmwood. On July 12, 2017, Deputy Graham was on duty and acting under the color of law and in the course and scope of his employment.

4. Elmwood has a formal grievance procedure available to inmates. The grievance procedure requires inmates to notify a module officer and attempt to resolve the issue. If the issue is not resolved, the inmate can fill out a grievance form. A module officer must accept the grievance and refer it to a sergeant. All copies of grievance forms are filed and kept for approximately five years. Plaintiff was aware of Elmwood's grievance procedure.

5. Plaintiff did not file a grievance form regarding the November 2016 contraband search. However, plaintiff filed two grievance forms regarding the July 2017 altercation.

## I. November 7, 2016 Contraband Search

6. On November 7, 2016, deputies at Elmwood performed a contraband search after receiving an anonymous tip. The anonymous tip provided deputies with probable cause to perform contraband searches of cells and strip searches of inmates.

7. Plaintiff's cell was searched, and plaintiff was strip searched.

8. Deputy West did not make the decision to perform the contraband search or strip search of plaintiff.

9. The contraband search required separate teams of approximately four deputies to enter inmates' cells. The teams then escorted inmates to individual interview rooms for strip searches.

10. West was assigned to the team for plaintiff's cell. West and his team entered plaintiff's cell and escorted plaintiff and plaintiff's cellmate to the interview rooms.

11. Plaintiff was strip searched in an interview room. Pursuant to the search, plaintiff removed all of his clothes, squatted, and coughed.

12. During plaintiff's strip search, Deputy Bettencourt indicated that there was something in plaintiff's rectum. Plaintiff performed a rectal cavity search. After the rectal cavity search, supervising deputies decided to place plaintiff on a potty watch.

13. A potty watch required plaintiff to stay in a room until plaintiff passed stool. The stool was checked for drugs.

14. After the strip search, plaintiff complied with instructions to redress. Deputies placed plaintiff in handcuffs and ankle cuffs and instructed plaintiff to wait in the interview room. After approximately seventeen minutes, deputies returned, removed plaintiff's handcuffs and ankle cuffs, required plaintiff to take off his clothes against, placed plaintiff in a white "bunny suit," taped mittens around plaintiff's hands and feet, handcuffed, and took plaintiff to another room

15. No drugs were found from plaintiff's potty watch.

16. Deputy West was never alone with plaintiff during the contraband search of plaintiff's cell, plaintiff's strip search, or plaintiff's potty watch.

17. Deputy West did not decide to perform the strip search of plaintiff. During plaintiff's strip search, Deputy West did not falsely claim that he saw contraband in plaintiff's rectum and did not prompt plaintiff's rectal cavity search.


## II.        July 12, 2017 Altercation

18. On July 12, 2017, plaintiff was in custody at the Elmwood Facility, housed in M5-D cell 33.

19. M5-D is a two-story housing unit with two tiers of cells overlooking an open area with tables and a deputy station. Plaintiff's cell, #33, is on the second tier of M5-D.

20. Around 7:30 p.m., plaintiff and approximately 64 inmates were allowed out of their cells for activity and program time. At some point during program time, plaintiff spent some time on the sundeck.

21. Deputy West was assigned to guard the M5-D and supervised the inmates during program time. Deputy West was the only staff member inside M5-D.

22. During program time, Deputy West smelled something burning.  West went to the sundeck and saw approximately seven inmates crouching in the corner. At the time, Deputy West was unable to identify the two crouching inmates. Deputy West ordered all of the inmates to "lockdown."

23. "Lockdown" is a command for inmates to return to their cells.

24. Plaintiff and the inmates returned to their cells.

25. After the inmates returned to their cells, Deputy West found a "wick" in the corner of the sundeck.

26. A "wick" is a homemade lighter fashioned with twisted toilet paper.  Possession and use of wicks are prohibited in in Elmwood.

27. Deputy West suspected the wick belonged to plaintiff and plaintiff's cellmate. Deputy West went inside the M5-D module, placed the wick on a table, and yelled at cell #33, accusing plaintiff of lighting the wick.

28. Plaintiff was in a locked cell during Deputy West's allegations. Plaintiff  responded that the wick did not belong to him.

29. After plaintiff denied possession of the wick, Deputy West ran up the stairs to plaintiff's cell, turned right at the stairs, and ran directly to plaintiff's cell.  Deputy West approached plaintiff's locked cell door and opened the locked door with his keycard.  Deputy West did not give plaintiff

and plaintiff's cellmate any instruction before entering the cell.

30. As Deputy West entered plaintiff's cell, Deputy West instructed plaintiff and plaintiff's cellmate to get back against the wall. Plaintiff was standing in the front of the cell when Deputy West entered. Plaintiff's cellmate jumped on the top bunk of the cell.

31. As plaintiff began to comply, Deputy West pushed plaintiff, resulting in plaintiff moving to the middle of the cell. Deputy West pushed plaintiff a second time. After a second push, plaintiff and Deputy West engaged in a "tussle" inside plaintiff's cell.

32. At some point during the tussle, Deputy West was able to pick up plaintiff and swing plaintiff over Deputy West's knee, resulting in Deputy West and plaintiff moving to outside of plaintiff's cell and onto the tier.

33. On the tier, plaintiff fell on his side and entered into a prone position with plaintiff laying on his stomach on the floor with his hands by his side.

34. After plaintiff entered a prone position, Deputy West went on top of plaintiff and placed his knees on plaintiff's lower back. Deputy West then reached for his pepper spray and pepper sprayed plaintiff's face. Even though the pepper spray was directed at plaintiff's face, some of the spray got into Deputy West's eyes.

35. While still kneeling on plaintiff's lower back, Deputy West repeatedly struck plaintiff in the head with his pepper spray can. Prior to the altercation, Deputy West was trained to not use the pepper spray can to his inmates in the head. Plaintiff loss consciousness while he was being struck in the head.

36. Responding deputies arrived and pulled Deputy West off plaintiff.

37. Because of the altercation, plaintiff suffered a laceration to his right eye and continues to suffer from headaches.

38. During the altercation between plaintiff and Deputy West, plaintiff's cellmate was unrestrained and remained in the cell with the cell door open. All remaining inmates in M5-D were locked in their respective cells during the altercation.

39. Plaintiff filed two grievance forms regarding the July 12, 2017 altercation.


**III.    July 12, 2017 Ride**

40. After the altercation with Deputy West, plaintiff was transported to main jail in a transport van by defendant Deputy Graham and Deputy Holly.

41. Deputy Graham drove the transport van and Deputy Holly rode in the passenger seat.

42. Plaintiff entered the transport van without assistance.

43. Deputy Graham drove the transport van to the main jail using the 880 freeway and First Street. The transport van did not swerve, speed, suddenly stop, or encounter any accidents. Deputies

Graham and Holly did not hear any complaints from plaintiff during the transport.

44. The transport van arrived at the main jail. At the main jail, Deputies Holly and Graham opened the door and found plaintiff lying on the ground in fetal position. Plaintiff was nonresponsive to the deputies' attempts to engage. After finding plaintiff Deputy Holly went inside of the main jail for assistance. Deputy Holly returned to the van with Nurse Mahalia McCoy and a sergeant.

45. Nurse McCoy inspected plaintiff and determined that plaintiff's vitals were normal. Nurse McCoy decided to take plaintiff to the main hospital for treatment of the laceration above plaintiff's right eye.

46. Deputies Graham and Holly transported Plaintiff from the main jail to the hospital without any objection or comment from plaintiff.

47. As a result of the July 2017 altercation with Deputy West, plaintiff suffered a laceration over his right eye and continues to have painful headaches.


# CONCLUSIONS OF LAW

1. This Court has federal question jurisdiction to decide this action brought under the authority of 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.")

2. Venue is proper because the events giving rise to plaintiff's claims occurred in Santa Clara County, which is within the Northern District of California. 28 U.S.C. §§ 84(a), 1391(b).

3. To prevail on an excessive force claim under the Fourteenth Amendment and 42 U.S.C. § 1983, "a pretrial detainee is required to show only that the force purposely or knowingly used against him was objectively unreasonable." *Mcfarlin v. Penzon*, 848 Fed.Appx. 685, 697 (9th Cir. 2021) (citing *Kingsley*, 576 U.S. at 397-98) (internal quotation marks omitted). The Court considers the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained" and may consider the following factors on the reasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting. *Stevenson v. Jones*, 254 F.Supp.3d 1080, 1090 (N.D. Cal. 2017). Generally, plaintiff is not required to prove more than trivial force. *See Acasio v. Lucy*, 14-cv-04689-JSC, 2017 WL 1316537 at *6 (N.D. Cal. 2017) ("When the circumstances show that there is no need for force, any force used is constitutionally unreasonable.")

4. When assessing a defendant's amount of force, "there are two state-of-mind issues at play." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016). "The first concerns the defendant's state of mind with respect to his physical acts—*i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world. The second question concerns the defendant's state of mind with respect to whether his use of force was 'excessive.'" *Kingsley v. Henrickson*, 576 U.S. 389, 395 (2015).

5. The Bane Act "establishes a private right of action for damages and other relief against a person who 'interferes by threats, intimidation, or coercion,' or attempts to so interfere, with the exercise or enjoyment of an individual's constitutional or other legal right." *Gillan v. City of San Marino,* 147 Cal. 4th 1033, 1044 (2007). In excessive force cases, the Bane Act does not require proof of coercion, intimidation, or threat "beyond that inherent in the underlying [constitutional] violation." *Rodriguez*, 891 F.3d 776, 802 (9th Cir. 2018). A finding of excessive force in violation of the Fourteenth Amendment may be sufficient to support a finding of a violation of the Bane Act. *Cf. id.* ("Because [the plaintiffs] provided evidence to support a finding that they were subjected to excessive force in violation of the Eighth Amendment, they necessarily provided evidence sufficient to support a finding of a violation of 11 their rights under [the Bane Act].")

5. To prevail on a claim of Intentional Infliction of Emotional Distress ("IIED"), plaintiff must show by a preponderance of the evidence (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (citing *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965 (1993)).

## I. Plaintiff's Claims Against Deputy West

6. As a preliminary matter, plaintiff satisfies the exhaustion requirements of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) for his 42 U.S.C. § 1983 against Deputy West regarding the July 2017 altercation. Plaintiff submitted two grievance forms about the July 2017 Altercation.

7 However, plaintiff did not satisfy the PLRA's exhaustion requirements for his 42 U.S.C. § 1983 against Deputy West for the November 2016 Contraband Search. *See Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (explaining that although "the appropriate device [for a PLRA nonexhaustion defense] is a motion for summary judgment . . . the district judge may decide disputed questions of face in a preliminary proceeding.").

8. Elmwood facility has a formal grievance procedure. Plaintiff did not file any grievance forms in 2016 and failed to provide evidence that plaintiff submitted a grievance form regarding the November 2016 Contraband Search. *See Merchant v. Corizon Health, Inc.*, 993 F.3d 773, 742 (9th Cir. 2021) ("'[T]he defendant in a PLRA case must plead and prove nonexhaustion' . . . Once the defendant has made such a showing, 'the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him.'") (internal citations omitted).

9. On July 12, 2017, Deputy West knowingly and purposefully took an affirmative act of force against plaintiff by intentionally striking plaintiff in the head with a pepper spray can approximately six times. *See Castro v. County of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016) (holding officer's state of mind with respect to his physical acts intentional because the "officer had taken the affirmative act of using force knowingly and purposefully."). Deputy

West testified that he intentionally struck plaintiff with the pepper spray and that his actions on July 12, 2017 were not made in error or otherwise an accident. *See Kingsley v. Henrickson,* 576 U.S. 389, 396 (2015) ("[I]f an officer's Taser goes off by accident or if an officer unintentionally trips and falls on a detainee, causing him harm, the pretrial detainee cannot prevail on an excessive force claim. But if the use of force is deliberate—i.e., purposeful or knowing—the pretrial detainee's claim may proceed.").

10. Deputy West's discovery of a wick in the sundeck did not justify his decision to initiate contact with plaintiff and improperly enter plaintiff's cell alone. *See Kingsley*, 576 U.S. at 397 ("Considerations such as the following may bear on the reasonableness or unreasonableness of the force used . . . the severity of the security problem at issue"). Deputy West's suspicion that the wick belonged to plaintiff was unreasonable. Deputy West testified that he saw "two individuals" crouching in a corner of the sundeck, but could not see what the two individuals were doing. TR 542 at 2-5, 19-21. Although Deputy West testified that he "later identified" the two crouching individuals as plaintiff and plaintiff's cellmate, Deputy West failed to explain how he made that identification.[1] Deputy West later testified that plaintiff and plaintiff's cellmate acted as if "they already knew. They already knew that they – basically that it was them" after Deputy West instructed the inmates to lockdown. TR 545 at 5-6. The Court is unpersuaded by Deputy West's justification. According to Deputy West's testimony, there were approximately seven inmates in the sundeck when Deputy West initially saw the two crouching individuals. Notably, both plaintiff and plaintiff's cellmate testified that the wick did not belong to them. *Cf. Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 327 ("The need for a particular search must be balanced against the resulting invasion of personal rights.") Accordingly, the wick does not demonstrate that plaintiff was a security threat to anyone else in the jail. *Cf. Durham v. County of Monterey*, 18-cv-4467-AGT, 2020 WL 9395224 at * 8 (Apr. 29, 2020) (finding no threat of security problem because inmate was in his cell, not a threat to anyone else, and actions did not require defendant to take immediate action).

11. Moreover, Deputy West's decision to enter plaintiff's cell alone to perform a contraband search without first requesting assistance from other deputies was objectively unreasonable. In November 2016, Deputy West was trained to not enter inmates' cells and perform contraband searched without assistance of other deputies. On July 12, 2017 Deputy West was told by his supervisors that he should have waited for assistance before entering plaintiff's cell *See Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 330 (2012) ("[D]efference must be given to the officials in charge of the jail unless there is substantial evidence demonstrating their response to the situation is exaggerated.") (internal citations and quotation marks omitted).

12. While in plaintiff's cell, Deputy West did not exercise any effort to temper or to limit his amount of force. Deputy West did not give plaintiff a chance to comply with his orders and

---

[1] Later in Deputy West's testimony, when asked how he knew the wick belonged to plaintiff and plaintiff's cellmate, Deputy West testified that "they were the only ones in that corner right there, where the burning wick was going." TR at 544 at 22-25; 545 at 1. However, given Deputy West's prior testimony indicating that he did not see the two crouching individuals and "later identified" the individuals to be plaintiff and plaintiff's cellmate, the Court does not find Deputy West's testimony as a proper identification of plaintiff and plaintiff's cellmate. Deputy West did not explain how he "later identified" the two crouching individuals as plaintiff and plaintiff's cellmate.

immediately initiated contact.

13. After Deputy West entered plaintiff's cell, a tussle between plaintiff and Deputy West occurred. The tussle ended when Deputy West lifted plaintiff over Deputy West's knee and threw plaintiff onto the tier. On the tier, plaintiff entered a prone position and Deputy West climbed on top of plaintiff and placed both of his knees on plaintiff's back.

14. Plaintiff did not actively resist Deputy West when he and Deputy West were on the tier. Deputy West was able to climb on top of plaintiff while plaintiff was in a prone position. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1094 (9th Cir. 2013) (defining active resistance as an affirmative step to contravene officer orders or engag[e] in behavior that posed some threat to officer safety); *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir.2012) ("A failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force").

15. The Court does not find the testimonies of deputies Alvarez, Benson, and Vazquez to be credible regarding plaintiff's alleged active resistance because the deputies arrived on the scene after Deputy West already stuck plaintiff with a pepper spray can.

16. Deputy West's perception of a threat while kneeling on plaintiff's back was unreasonable. Plaintiff was not resisting by the time Deputy West kneeled on plaintiff's back. Plaintiff was in prone position and Deputy West knew plaintiff had already been pepper sprayed. *See Cortesluna v. Leon*, 979 F.3d 645 (9th Cir. 2020) ("By the time [defendant] put pressure on Plaintiff's back, Plaintiff no longer posed a risk. He was lying face down on the ground, experiencing visible pain from having been shot by the two beanbag rounds, and not resisting").

17. Although plaintiff and Deputy West were previously engaged in a tussle, the tussling ended when Deputy West lifted and threw plaintiff on the tier. *See id.* ("[J]ust as circumstances can escalate rapidly . . . circumstances can de-escalate rapidly. Logic thus dictates . . . a use of force that may have been reasonable moments earlier can become excessive moments later."). Deputy West claimed plaintiff's cellmate could pose a threat. However, Deputy West never saw plaintiff's cellmate on the tier and previously witnessed plaintiff's cellmate to be complying with Deputy West's orders. *See Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (finding officers were unreasonable in believing plaintiff's friends posed a threat because officers not seen the friends to be engaged in any violent conduct). Moreover, Deputy West knew that more deputies were coming to his location because Deputy West hit his pack set alarm when he entered plaintiff's cell. TR 553 at 3-4. Finally, Deputy West was kneeling on plaintiff's back and had already subdued plaintiff by repeatedly pepper spraying plaintiff. *See LaLonde v. Riverside*, 204 F.3d 947 (9th Cir. 2000) ("A jury could reasonably conclude that the officers' deliberately allowing the plaintiff to suffer the consequences of the pepper spray after he had fully surrendered and was under their control constituted excessive force.")

18. The Court does not find Deputy West's testimony regarding the July 12, 2017 altercation to be credible because of the inconsistencies in Deputy West's testimony. *Compare* TR 553 at 3-4 ("when he rushed me . . . I managed to hit my pack set alarm) *with* TR ("I didn't know if my pack set alarm went off."); *compare* 552 at 1-2 ("I was able to, like reach under my body and grab my pepper spray and spray him) *and* 553 at 9-13 ("I pepper spray him. And then, when I pepper spray him, I get him to let go" w*ith* 552 at 17-19 ("I didn't even know if I pepper

sprayed him yet. I wasn't sure if I even got him"); *compare* TR 553 at 13 ("I struck him, like, twice.") *and* 554 at 23-24 (testifying hit plaintiff with "my right hand.") *with* 563 at 13-15 ("I didn't intend to strike him with the pepper spray bottle; so I didn't think I did."). Moreover, Deputy West initially declined to go to the nurse after the incident, TR 391 at 2-13, and photographs of Deputy West after the altercation do not show extensive redness or swelling around the eyes. Ex. 328.

19. Deputy West's use of the pepper spray can to repeatedly strike plaintiff in the head was unreasonable because that plaintiff was subdued in a prone position and Deputy West was already kneeling on plaintiff's back. *See Headwaters Forest Defense v. County of Humbolt*, 276 F.3d 1125 (9th Cir. 2002) ("[T]he use of pepper spray may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force."). Deputy West was trained to not use the pepper spray can against inmates and knew the danger of striking plaintiff in the head with the pepper spray can. *See Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012) (finding use of force unreasonable where defendants used pepper spray projectiles on plaintiff because the "intrusion on [plaintiff's] person encompassed both the physical blow from the force of the projectile and the chemical effects of the pepper spray" and defendants "were advised not to shoot pepperballs indiscriminately or at individuals that were not posing a threat . . . or shoot at any distance if there was a possibility that the target could be hit in the head or if other damage was possible.")

20. Plaintiff suffered from a deep laceration above his right eye and currently suffers painful headaches.

21. For the reasons stated above, the Court finds Deputy West's striking plaintiff approximately six times with the pepper spray can on July 12, 2017 to be objectively unreasonable and in violation of the Fourteenth Amendment and 42 U.S.C. § 1983.

22. For the same reasons, the Court finds Deputy West violated plaintiff's constitutional rights under the Fourteenth Amendment and is in violation of the Bane Act. *Rodriguez*, 891 F.3d 776, 802 (9th Cir. 2018) ("[I]n excessive force cases. . .[the Bane Act] does not require proof of coercion beyond that inherent in the underlying violation.")

23. The Court finds plaintiff failed to prove his IIED claim. Even though plaintiff established that he suffered a physical injury from the altercation, plaintiff did not establish that he suffered severe or extreme emotional distress because of the altercation. *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (requiring showing of plaintiff's suffering severe or extreme emotional distress to establish IIED)

## II.  Claims against Christopher Graham

24.  The Court finds plaintiff failed to establish that Deputy Graham violated plaintiff's constitutional rights during the alleged rough ride.

25  Plaintiff was not able to testify about the events of his transportation to the jail and the hospital. Therefore, plaintiff did not establish that defendant Graham intentionally speed, suddenly

stopped, swerved, or otherwise act to punish plaintiff. Video evidence of the alleged rough ride only established plaintiff was lying on the ground of the transport van when the van arrived at the jail. The video does not show the events of the actual ride.

26. Accordingly, the Court finds plaintiff did not prove his claims regarding Deputy Graham by a preponderance of the evidence.

## III. Damages

27. Plaintiff established that plaintiff suffered a deep laceration above plaintiff's right eye and continues to suffer from painful headaches because of the July 12, 2017 altercation with Deputy West. Accordingly, plaintiff is entitled to compensatory damages. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992) ("[N]o compensatory damages may be awarded in a § 1983 suit absent proof of actual injury); *United States v. Northrop Corp.*, 59 F.3d 953, 967 (9th Cir. 1995) ("Section 1983 exists both to vindicate the public interest in deterring deprivations of constitutional rights and to compensate those actually injured.")

28. The Court hereby awards plaintiff compensatory damages of $10,000 against defendant Deputy Rico West.

29. For the reasons stated above, the Court finds Deputy West's actions, particularly his decision to disregard his training of contraband searches and repeatedly striking plaintiff in the head with a pepper spray can, to be either reckless or callous disregard of, or indifference to, the rights or safety of plaintiff Aaron Steward. *Smith v. Wade*, 461 U.S. 30, 51 (1983). Defendant Deputy West's actions were a shocking abuse of power. Accordingly, plaintiff is entitled to punitive damages of $1000. *See Rodriquez v. County of Los Angeles*, 891 F.3d 776, 806 (9th Cir. 2018) (affirming punitive damage awards in excessive force case against individual defendants ranging "$10,000 to $15,000, with the exception of one award of $30,000" given the "egregiousness of the conduct, the proportionality between punitive and compensatory damages awards, and the amount of the punitive damages awarded or upheld in similar cases.").

30. The Court hereby awards plaintiff punitive damages of $1,000 against Defendant Rico West. *See generally id.* (affirming punitive damages award against individual defendants ranging "$10,000 to $15,000, with the exception of one award of $30,000" to plaintiffs who suffered broken bones and tasing to the buttcheeks and between the testicles and anus).

31. Given plaintiff's limited success in his claims that relate to his pre-trial detention against defendant Deputy West and Deputy Graham, plaintiff is awarded attorneys' fees to the extent of his claims against Deputy West for the July 12, 2017 altercation. *See Webb v. Sloan*, 330 F.3d 1158, 1169 (9th Cir. 2003) (finding discretionary reduction of attorneys' fees to reflect limited success appropriate where plaintiff initially sued several defendants, but prevailed against only one, and had claims related to plaintiff's arrest, detention, and prosecution).

///

///

**CONCLUSION**

Having made the above findings of fact and conclusions of law, the Court will enter judgment in favor of plaintiff in the amount of $11,000 as to plaintiff's claims against defendant Deputy Rico West for the July 12, 2017 altercation. Judgment will be entered against plaintiff to the extent of plaintiff's claims against Deputy Rico West for the November 2016 Contraband Search and against Deputy Christopher Graham for the July 2017 Ride.

**IT IS SO ORDERED**.

Dated: July 13, 2021

SUSAN ILLSTON
United States District Judge